I'm having trouble hearing you. Okay. Thank you. Is it better, Your Honor? Yes, thank you. Thank you. Good morning, Your Honors. Chung N. Phang, appearing on behalf of Petitioner Jing Xiaoming. Your Honor, we have actually briefed this case extensively, so we are not going to repeat the points that we have made in our opening brief. But we'd like to And the IJA did not cite any specific and cogent reasons for his disbelief. And where the reasons are cited, I think the record would show that, indeed, Petitioner had testified credibly. And I would like to highlight some of the evidence that had been only partially examined by the IJA in this case, if I may. Sure. Okay. Did you mind addressing one issue, Mr. Chung? Yes, of course. One of the inconsistencies or the factors the IJA relied on was the fact that your client did not have the IUD removed for a great period of time in the United States. Is that right? Yes, correct. And what's your response to that? My response to that, Your Honor, is that the timing of the removal of the IUD is clearly related to her coming to consult an immigration lawyer, Mr. Phang, and this, myself. Okay. And that the IJA had incompletely reviewed that record. And because the government counsel's briefing and the Justice Department briefing had actually ignored the fact that there are actually two affidavits on the record. Okay. And one of them is that AR-474. And the second one, which has actually been discussed by the government and also by the IJA, is the second affidavit, which is the one on AR-474, is actually on 2-15. The one on AR-474 actually is a contemporaneous diagnosis of the meeting and consultation with Dr. Tuan. And that happened actually precisely as petitioner said it happened, i.e., in 2002. And the doctor's note affidavit on that day is June 24, 2002. And in that medical diagnosis, in that affidavit, the doctor said that Ms. Jing is, quote, currently under my care. That means now under my care. Okay. Current, I would say, means now. However, in the second affidavit submitted by the doctor, AR-215, the doctor said, Ms. Jing has been under my care for two years. Okay. A lot of confusion happened at the cross-examination when the government attorney actually misstated the record and said that, challenged her and said that, well, is it true that you have met Dr. Jing before 2002? And I'm referring to the AR-215. Okay. And at first, a respondent, a petitioner said no. When challenged, but we have a record where the doctor's letter says that you have met her before 2002, then she gave an uncertain answer. He said, is that incorrect, the government lawyer said. She answered, not incorrect. Counsel, I can see how that miscommunication took place. Yes, there was miscommunication in there. But that really doesn't answer the question of why she waited so long in any event to seek the medical advice and removal of the IUD. Right. As we explained in our brief, people in those medical conditions come in from a foreign country, and I think the key thing here is understanding her fear, that she had no assurance that she would not be kicked out of the United States until she met our office, the asylum. And that was in May 2002. In June, she got the IUD removed. So I think the uncertainty over that period is understandable, given her ignorance of U.S. conditions, her ignorance of U.S. laws. Why doesn't the delay have a bearing on the believability of her assertion that that's why she left China in the first place? If you, you know, if you're leaving because, you know, your arm is falling off, then presumably you would do something about that before four years had elapsed. And it's not that dramatic. But why isn't the delay rationally related to the believability of that being the reason for her departure in the first instance? That is a fair question, Your Honor. And I would refer the Court to Administrative Record 280. See, aliens who have had this kind of coercive population control policy often do suffer in silence. That's a fact. And often do not know how to deal with the conditions, having lived under the coercive policy for so long. And, Your Honor, if I could point out to Administrative Record 280, there was a case in Texas, okay, reported by the Dr. Pat McCallister, Assistant Professor of Family Medicine at Baylor College. And this was actually put in the Administrative Record, Your Honor, where a woman was found to be close to death from the IUD when she was seen by this assistant professor. And that explains, that actually illustrates people who don't know what to do, who are put in a policy where they think that it's the law of the government, the law of nature almost, that there's nothing they could do about it. And I think it's a combination of ignorance of the law. But presumably her assertion is that she did know she could do something about it, and that's why she came to the United States. I mean, she's asserting that as her reason for having left. Yes, yes. So it seems inconsistent to say I left because this was done to me, but I came and then I didn't have it undone for several years. That's, that's, it seems to me permissible for someone to draw that inference that that's inconsistent. Yes, Your Honor. It is an understandable inference, but I think one has to look at the asylum seeker's mind, where, you know, in China she had been specifically warned that if you remove your IUD, we will sterilize you, okay. So that threat is very specific, and it is in the record, Your Honor. And so with that kind of threat, you know, until she is reassured about her possibility of staying here, she could not make that decision. So the threat from your perspective was not just the fact that she had this IUD. It was the threat to her, her family, her loved ones, as long as she was in China, and that's what she was trying to do. Exactly, exactly. And until she knows that that threat, that there's a reasonable chance to seek asylum here, she's not going to remove the IUD because she's furious that she's going to be back in China. Yes, until she has some reassurance that she has some means of staying here legally. She could not make that jump. And it is true that, you know, that at times aliens' decision-making process baffles us in the United States. Myself, having been an alien for some time, you know, that actually I understand, okay, that people from different cultures behave differently. And some of the things that do not look rational from our context, you know, is perfectly understandable, you know, once the cultural variable is actually taken into account.  Katherine Clark Good morning, Your Honors. My name is Katherine Clark, and I'm representing the government. The question here is whether the evidence compels the conclusion that Jin, a university-educated accountant who had had contact with the U.S. in 2006, was telling the truth when she stated that she, when she implausibly argued that she could not find a doctor until she consulted with her immigration lawyer four years after she arrived in the United States. And whether it was supported by substantial evidence for the immigration judge to conclude that she was, that her testimony, that she would not remove an IUD that made her feel, as she testified, like she was dying, would, was simply implausible. Jin claimed that she left her husband and daughter in China in 1998 because she was experiencing ongoing and serious problems from her IUD. However, she did nothing to remove that IUD or even to have it examined until she consulted with her immigration lawyer in 2002 and decided to apply. Was that the only reason that she left? She stated that that was the reason that she left in 1998. She stated that she was experiencing problems from the IUD being forcibly inserted and that the Chinese government would not allow her to remove the IUD. And she had requested permission to remove the IUD six or seven times, and that is why she decided to apply. And that is why she decided to come to the United States. She also claimed that she did not want to get in trouble for removing the IUD, but she did, when she applied for asylum, she had no guarantee that that application would be granted. And so simply learning that there was the opportunity to seek asylum in the United States is not the same as having an assurance that she would be able to stay here. And so simply it doesn't make sense. So doesn't that somewhat explain why she might delay actually removing the IUD once she came to the United States? Because her fear was not just the, her problem was not just the great pain and discomfort caused by it, but the fear of retribution by the Chinese government if she were to remove it. That still does not explain why she would remove the IUD in 2002, because there was still, 2002 when she consulted with her immigration lawyer. The immigration lawyer did not suddenly provide a guarantee that she would be able to stay in the United States. So she, it doesn't explain the difference that she claims to have felt between the 10 years that she had this IUD and that it was allegedly causing her so much trouble. And all of a sudden in 2002 when she learned about asylum, allegedly that was the point where she felt comfortable. There was no guarantee that that application would be granted. But on the objective evidence, she says that she was experiencing extreme discomfort with the IUD in China. And then the doctor's notes some four years later indicate that she was having back pain and other symptoms associated with the IUD were removed. So doesn't that at least indicate that in terms of her objective symptoms, her testimony was truthful? Even if she was being truthful with respect to the symptoms themselves, that does not negate the idea that, that does not compel the conclusion that she was telling the truth about her fear. She was able to request removal of the IUD again six or seven times in China, but then despite being a university-educated accountant, despite having what she concedes was at least rudimentary knowledge of English, despite speaking Mandarin as well, which is not, as the IJ found, an uncommon dialect, she was unable to request removal of the IUD, even seeing a doctor, examination of the IUD, anything of that sort once she arrived in the United States. So... That would convince me completely if there was not the risk of having to go back to China. And it really, and I understand your argument that there's nothing magical about meeting the immigration attorney in 2002 that assured her of asylum, but perhaps that provided her the kind of a tipping point where she thought the odds, at least there was a chance that she wouldn't have to go back to China, and so now she was willing to go through and deal with the risk. I mean, these are all calculated risks that an individual person is trying to weigh out. It's not a black-or-white situation. I mean, it's not a black-or-white situation. It's not a black-or-white situation. But the central claim here really is that she fears sterilization if she goes back to China, right? That is, the settlement claim that it is not credible. Her testimony is that she suffered a forced abortion in China and they inserted the IUD. She tried to get the IUD removed because it was uncomfortable, and then fled to the United States, or came to the United States and stayed. Now, if her doctor had not reported that she was having discomfort, one could easily say, yeah, this delay is unexplainable. But the objective evidence seems to be that she was having significant problems. So why doesn't that indicate that there's an issue of truthfulness about her story? Because what she feared was sterilization if it were removed and she was sent back to China. The question is not whether it could be explained in that way. No, but you start off by saying this story was implausible. I'm responding to what you're talking about. I understand the standard of review, if that's what you're going to come back with me. But I just want to know, why isn't that plausible? The finding was not that it was implausible that she had the symptoms. And the objective evidence really only establishes, A, that she had symptoms at the time her IUD was removed in 2002, and that she had the IUD, in fact, removed in 2002. What the judge found implausible was that there would be, both at the same time, two things occurring. One, the 10 years of horrendous symptoms that Jin herself conceded made her feel like she was dying. And the four-year delay once she arrived in the United States. And additionally, Jin was here for a year in 1996. She said she saw a doctor during that period, and she said that these symptoms were lasting for 10 years. So it can be assumed then that there were a problem during that first time that she saw a doctor in 1996. Yet she voluntarily returned to China, did not seek asylum at that time. And then she came back here and still did nothing to get the IUD issues resolved. Why doesn't that cut the other way, though, in terms of saying, because the fear isn't that. I mean, this isn't a case about failure to seek medical treatment. That would not be a ground on which an IJ could grant relief for asylum. The question is forced sterilization, the fear of forced sterilization, right? But Jin has presented no actual credible evidence that she faces forced sterilization upon return to China, because the implausibility, additionally the contradiction between her testimony and her doctor's affidavit regarding how long she saw the doctor, and additionally the questionable nature of the eviction notice and the testimony regarding the alleged eviction. With respect to, excuse me, is there any evidence other than her own testimony that she would face forced sterilization on account of not having an IUD in place? There is no direct evidence pertaining to her claim other than her own testimony on that point. And that testimony was found incredible in this. For example, is there any expert testimony about the nature of the family planning policy or a copy of it or something like that that would support her assertion that that's what she would face? There is expert testimony in the case, but not on that issue. The expert testimony in the case concerns the consequences of discovery of an asylum application, and that which, of course, might be relevant if the claim that the, if Jin's claim that the authorities had discovered her asylum application was, in fact, credible. But just to resolve the previous point, all of those inconsistencies cast doubt on her entire claim as they went to the heart of her claim. But why does the eviction go to the heart of her claim? I'm sorry? Why does the eviction go to the heart of her claim, that issue? Because part of her claim was that she was, that was that her family was evicted because it was discovered that she had sought asylum in the United States. And so that was a ground for her seeking asylum. And thus it went to the heart of her claim. The immigration judge also noted that the central inconsistency was regarding the, were the issues, the implausibility and the inconsistency with Dr. Tuan's affidavit. So those two were addressing the IUD and the family planning issues, but the eviction notice problems also went to the heart of her claim, provided additional basis for the immigration judge's finding that she was dishonest overall, and that, and provided additional substantial evidence for that conclusion. And the evidence just does not compel the conclusion that Jin has a reasonable fear, either based on her, the family planning policy alone, or the fact that she applied for asylum. The immigration judge discredited her testimony regarding both of her claims, and the petitioner here today does concede that the inference that the immigration judge made was understandable. And given the standard of review in this case, the evidence does not compel the conclusion that Jin faces persecution in China or that she was credible. And unless the Court has any other questions. Thank you, Counsel. You're good over your time. Thank you. Got a minute and a half left. On the eviction issue, I think this circuit had proved in 2000 that we are not in a position, that the IJA is not in a position to rule how fast or the speed with which government bureaucracies would act. And I think there's a Chalkoff case, C-H-O-U-K-N-O-V. And additionally, on the timing of the eviction, Your Honor, I think it's important to note that the analysis of the IJA is actually quite incomplete in that the two notices at issue were not truly analyzed and compared with each other. And one, of course, is the actual eviction, which is on 409 and 408, which is on Sheraton Hotel later head. And the IJA said, well, there's a kind of thing that you could get from hotel room. The fact reflects otherwise. If one looks at what's under that later head, it says Sheraton Overseas Management Corporation as agent for Tianjin Yanyuan International Hotel. And moreover, I'd like to refer the Court to AR 475 and 476, the actual termination later. And that itself has no later head, and yet there was no question as to its authenticity. Moreover, if one looks at the content of that later, there's absolutely no reference to termination of housing. So that tends to bolster Petitioner's explanation that housing termination is not automatically tied to her employment. And if one compares that with the actual eviction later, 409 on the Tianjin Sheraton later head, that eviction also does not mention anything about termination of employment. It only mentioned that this woman had harmed our country's national image. So in other words, she had committed a political offense. And in fact, a careful review of the record would show that it is the political offense of asylum which became known to the Chinese government that actually triggered the eviction. Thank you. No, she actually is here right now in the United States. She has not gone back. No, no, I mean, the testimony indicated that she was in the United States working for the Disney Corporation. She's still employed there? No. Okay. Thank you. May I proceed? May it please the Court. My name is Carrie McConaghy-Harris, here with David Michael Cantor. Pro bono representing Ms. Valinda Jo Elliott, the plaintiff appellant in these proceedings, Your Honors. I know you're fully aware of the issue presented and the background facts and law of the case, so I would like to jump right in to the most important sub-issues that I think there are, respond to some of the issues raised in the amicus and in the response brief. And if you, of course, have any questions on any aspects of the case, I'm happy to answer them.
judges: Thomas, Graber, Larson